**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-15-0000309**
**26-JUL-2019**
**10:02 AM**

NOS. CAAP-15-0000309 & CAAP-15-0000395

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

AMERICAN SAVINGS BANK, F.S.B., a federal savings bank, Plaintiff-Appellee, v. JOHNNY KINMAN CHAN; JEAN TOSHIKO CHAN; DIRECTOR OF TAXATION, STATE OF HAWAII; CAPITAL ONE BANK (USA) N.A.; HAWAII HOUSING FINANCE AND DEVELOPMENT CORPORATION, a Public Body and Corporate Politic, Defendants-Appellees, and VILLAGES OF KAPOLEI ASSOCIATION (incorrectly identified in the caption as ASSOCIATION OF APARTMENT OWNERS OF THE VILLAGES OF KAPOLEI), Defendant-Appellant, and JOHN DOES 1-10; JANE DOES 1-10 and DOE PARTNERSHIPS, CORPORATIONS or OTHER ENTITIES 2-20, Defendants

(CIVIL NO. 13-1-0944)

AND

VILLAGES OF KAPOLEI ASSOCIATION, a Hawaii non-profit corporation, Plaintiff-Appellant, v. JOHNNY KINMAN CHAN, JEAN TOSHIKO CHAN; FIRST BANK NATIONAL ASSOCIATION; DEPARTMENT OF TAXATION, STATE OF HAWAII; CAPITAL ONE BANK (USA) N.A.; HAWAII HOUSING FINANCE AND DEVELOPMENT CORPORATION, a Public Body and Body Corporate and Politic, Defendants-Cross-Claim Defendants-Appellees, and AMERICAN SAVINGS BANK, F.S.B., a federal savings bank, Defendant-Cross-Claimant-Appellee, and JOHN DOES 1-50; JANE DOES 1-50; DOE CORPORATIONS 1-50; DOE PARTNERSHIPS 1-50; DOE ENTITIES 1-50; AND DOE GOVERNMENTAL UNITS 2-50, Defendants, and JOHN ROES 1-10, JANE ROES 1-10, and ROE PARTNERSHIPS, CORPORATIONS or ENTITIES 1-20, Additional Cross-Claim Defendants-Appellees

(CIVIL NO. 12-1-2466)

APPEALS FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT

MEMORANDUM OPINION
(By: Leonard, Presiding Judge, and Reifurth and Hiraoka, JJ.)

This consolidated appeal arises out of two consolidated cases filed in the Circuit Court of the First Circuit ("Circuit Court")[1] concerning a disputed finding of the priority of competing liens and of the valuation of the senior lien between Defendant-Appellant Villages of Kapolei Association (the "Association") and Defendant-Appellee Hawaii Housing Finance and Development Corporation ("HHFDC"). The underlying foreclosure of the mortgage lien by Plaintiff-Appellee American Savings Bank, F.S.B., a federal savings bank ("ASB"), is not in dispute.

The Association appeals from the March 4, 2015 Judgment[2], and the April 16, 2015 Judgment relating to the March 4, 2015 order granting HHFDC's motion for summary judgment filed on April 22, 2014 ("Order Granting HHFDC's MSJ"). In so doing, the Association contests the Order Granting HHFDC's MSJ; the Order Granting ASB's Motion for Confirmation of Sale; the April 17, 2015 Further Order Regarding Plaintiff American Savings Bank's Motion for Confirmation of Sale, for Disposal of Personal Property, for Distribution of Proceeds and for Order Directing Entry of Deficiency Judgment and Writ of Possession, Filed December 9, 2014 ("Further Order re: Confirmation of Sale"); and any further order entered pursuant to the Minute Order dated March 9, 2015.[3]

On appeal, the Association alleges that the Circuit Court erred: (A) to the extent that it found, based on the retroactive application of HRS chapter 201H, that HHFDC had a

---

[1]    The Honorable Bert I. Ayabe presided.

[2]    This Judgment refers in its text to the "Findings of Fact, Conclusions of Law, and Order Granting [ASB's] Motion for Summary Judgment and For Interlocutory Decree of Foreclosure," but appears to actually be intended to relate to the March 4, 2015 "Order Granting Plaintiff's Motion for Confirmation of Sale, for Disposal of Personal Property, for Distribution of Proceeds and for Order Directing Entry of Judgment and Writ of Possession" ("Order Granting ASB's Motion for Confirmation of Sale"), based on the hearing date referenced on the title page, the fact that a judgment relating to the ASB's motion for summary judgment was already filed on May 12, 2014, and it is the latter order to which the Association directs its arguments on appeal.

[3]    The content of the March 9, 2015 Minute Order is essentially stated in the April 17, 2015 Further Order re: Confirmation of Sale.

2

lien that is senior and superior to all other parties except for ASB's lien and interest; (B) in finding and concluding that HHFDC had a lien that is senior and superior to all other parties except for ASB's lien and interest under the undated "Grantee's Agreement to Pay Housing Finance and Development Corporation a Share of the Net Appreciated Value of the Property" ("SAE Agreement") entered into between HHFDC and Defendants-Appellees Johnny Kinman Chan and Jean Toshiko Chan; (C) in finding and concluding that, "'HHFDC's appraisal value of $480,000 is the proper fair market value[,]' and that 'HHFDC's Net Appreciation is $228,532'"; (D) "in considering an appraisal that was filed with the Circuit Court the day before the hearing on HHFDC's [motion for summary judgment] and considering other evidence in connection with the motion to confirm sale to which the Association was not given a chance to respond[,]" and in failing to grant the Association's motion for reconsideration in connection with the aforementioned concerns; (E) in finding and concluding that HHFDC has any rights under the SAE Agreement as the successor or assignee of its predecessor, Housing Finance and Development Corporation ("HFDC"); and (F) "in granting summary judgment when genuine issues of material fact existed regarding the appraisal process and HHFDC's interest in the SAE Agreement."

We resolve the Association's points of error as follows, and we vacate and remand for further proceedings.

I.   BACKGROUND

A.   Factual Background

In June 1991, the Chans purchased the subject residential property (the "Property") in the Villages of Kapolei, a planned affordable housing community created by the HFDC. The Chans purchased the Property through HFDC's Shared Appreciation or Equity Program at a discount off the original fair market value, and financed the balance of the purchase price through a loan secured by ASB's mortgage, which was the first mortgage against the Property.

Through the Shared Appreciation or Equity ("SAE") Program, a qualified participant could purchase a new home at a

3

price below market-value. In exchange, the homebuyer contractually agreed by signing an SAE Agreement—a lien signed by the homebuyer and incorporated into the recorded deed—to share with HFDC the appreciation in the equity of the home if and when the property was ever sold or transferred ("Net Appreciation"). This appreciation owed to HFDC directly correlates to the discount that the homebuyer originally receives when purchasing the home. The Chans signed an SAE Agreement, subjecting them to terms and conditions regarding HFDC's rights to its share of Net Appreciation. The Property was conveyed to the Chans by way of a Quitclaim Deed, Covenants and Conditions dated June 6, 1991, and recorded in the Land Court on June 12, 1991 ("Deed"). HFDC's SAE Agreement was incorporated into the Deed.

All owners of lots in the Villages of Kapolei are members of the Association, and are subject to provisions of a declaration which provides covenants, conditions, and restrictions. Unpaid assessments and other charges against the Chans, pursuant to the declaration, gave rise to the Association's assessment and judgment liens, recorded in the Land Court on November 14, 2006 and September 5, 2012, respectively, and interest in the underlying foreclosure action. In 2013, the Chans defaulted on their mortgage with ASB.

B.    Procedural History

On October 1, 2012, the Association filed a complaint for foreclosure regarding the assessment and judgment liens in Civil No. 12-1-2466-10 against the Chans and various other defendants. On February 26, 2013, HHFDC was identified by the Association as an additional defendant. Meanwhile, on March 28, 2013, ASB filed a complaint for foreclosure in Civil No. 13-1-0944-03 against the Chans, the Association, and various other defendants.

The circuit court clerk entered default against the Chans on February 4, 2013, with regard to the Association's foreclosure action and on July 17, 2013, with regard to ASB's foreclosure action. The Association filed an answer to ASB's Complaint and asserted a counterclaim against ASB. On August 1, 2013, HHFDC was certified as a party defendant in ASB's

foreclosure action and subsequently filed an answer to ASB's complaint and a cross-claim against the Chans, the Association, and various other cross-claim defendants. In effect, HHFDC's answer and cross-claim and the Association's answer and counterclaim served as an assertion that each had second priority after ASB to any proceeds resulting from the foreclosure.

On September 20, 2013, ASB filed its motion for summary judgment against all defendants and for an interlocutory decree of foreclosure. On May 12, 2014, the Circuit Court entered findings of fact, conclusions of law, the order granting the motion, and the corresponding Hawai'i Rules of Civil Procedure ("HRCP") Rule 54(b)-certified judgment.[4]

On April 22, 2014, HHFDC filed its motion for summary judgment ("HHFDC's MSJ"), asserting its senior-lien status as to all parties except ASB's interest under the note and mortgage. The Association filed its opposition, and HHFDC filed its reply, setting forth a proposed value of its share of Net Appreciation calculated using its November 2013 appraisal report. HHFDC subsequently filed a supplemental reply memorandum, incorporating its updated September 21, 2014 appraisal report ("September 2014 Appraisal"), and asserting that the value of its share of Net Appreciation is $228,532 when calculated with the current fair market value of $480,000, based on the updated appraisal report. After hearing arguments on September 24, 2014, the Circuit Court took the matter under advisement.

On December 9, 2014, ASB filed its motion for confirmation of sale ("Motion for Confirmation of Sale"). On January 14, 2015, the day before the hearing on the Motion for Confirmation of Sale, the Circuit Court entered a Minute Order granting HHFDC's MSJ and finding that HHFDC's lien was senior and superior to all other liens with the exception of ASB's. The January 14, 2015 Minute Order did not mention the value of HHFDC's share of Net Appreciation. At the January 15, 2015 hearing on ASB's Motion for Confirmation of Sale, the auction for

---

[4] On November 18, 2013, the Circuit Court entered an order consolidating Civil No. 12-1-2466-10 (BIA) and Civil No. 13-1-0944-03 (BIA) into a single case.

the Property was reopened. The Association was the highest bidder, and the Property was sold to the Association for $370,000.

Proceeding to the issue of HHFDC's entitlement to Net Appreciation at the hearing, HHFDC offered the updated calculation of its share of Net Appreciation based on the $480,000 value submitted in its updated September 2014 Appraisal. The Association argued in response that the fair market value of the Property was $370,000 since the Property sold at auction for that price after competitive bidding and since the Circuit Court had determined that price to be "a fair and equitable price and as high as any that can be obtained under the circumstances." The court granted the Motion for Confirmation of Sale and ordered further briefing regarding calculation of the Net Appreciation.

On March 4, 2015, the Circuit Court entered the written Order Granting HHFDC's MSJ consistent with the January 14, 2015 Minute Order which determined HHFDC's lien status; the Order Granting ASB's Motion for Confirmation of Sale; and the corresponding HRCP Rule 54(b)-certified March 4, 2015 Judgment, that erroneously made reference to ASB's motion for summary judgment. *See supra* n.2.

On March 9, 2015, the Circuit Court entered the March 9, 2015 Minute Order, finding that HHFDC's appraisal value of $480,000 was the proper fair market value as of September 21, 2014, and ordering distribution of HHFDC's share of Net Appreciation after payment of ASB's lien.

On April 2, 2015, the Association filed its first notice of appeal under CAAP-15-0000309.

On April 16, 2015, the Circuit Court entered the HRCP Rule 54(b)-certified judgment related to the March 4, 2015 Order Granting HHFDC's MSJ. On April 17, 2015, the Circuit Court entered the Further Order re: Confirmation of Sale, a post-judgment order amending the prior March 4, 2015 Order Granting ASB's Motion for Confirmation of Sale. The further order essentially repeats the findings and conclusions stated in the March 9, 2015 Minute Order. The Association thereafter filed a motion for reconsideration of, and to alter or amend, the Further

Order re: Confirmation of Sale ("Motion for Reconsideration").

On May 7, 2015, the Association filed its second notice of appeal under CAAP-15-0000395.

II. STANDARDS OF REVIEW

*Summary Judgment*

"We review the circuit court's grant [of HHFDC's motion for] summary judgment *de novo*[,]" *Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citing *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)), viewing "all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion." *Crichfield v. Grand Wailea Co.*, 93 Hawai'i 477, 483, 6 P.3d 349, 355 (2000) (quoting *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)) (brackets and internal quotation marks omitted). "[A]ny doubt concerning the propriety of granting the motion should be resolved in favor of the non-moving party." *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995) (citing *Wright v. Fireman's Fund Ins. Cos.*, 14 Cal.Rptr.2d 588, 595 (Cal. Ct. App. 1992)), *aff'd*, 80 Haw. 118, 905 P.2d 624 (1995).

*Contract Interpretation*

Although a deed is generally not a contract, *Balogh v. Balogh*, 134 Hawai'i 29, 40 n.7, 332 P.3d 631, 642 n.7 (2014) (citing *Brown v. Brown*, 501 So.2d 24, 26 n. 1 (Fla. Dist. Ct. App. 1986)), the Deed here did more than merely convey an interest in land. The Deed contained covenants between the Chans and HFDC, namely the SAE Agreement, which held the Chans to a series of promises controlling the Chan's ability to sell or transfer the Property. This court may therefore apply contract principles to interpret the terms of the Deed. *See Balogh*, 134 Hawai'i at 40 n.7, 332 P.3d at 642 n.7 (distinguishing a deed, which conveys land, from a contract, which promises to do something and recognizing the application of contract principles to a quitclaim deed where parties treat the deed as a contract (citing *Moss v. Am. Int'l Adjustment Co.*, 86 Hawai'i 59, 63, 947 P.2d 371, 375 (1997))).

> "[T]he construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Brown v. KFC National Mgmt. Co.*, 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996) (citations and internal quotation marks omitted). "The determination whether a contract is ambiguous is likewise a question of law that is freely reviewable on appeal." *Id.* (citations omitted).
>
> Contract terms are interpreted according to their plain, ordinary, and accepted sense in common speech. *Cho Mark Oriental Food v. K & K Intern.*, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992). The court's objective is "to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety." *Brown*, 82 Hawai'i at 240, 921 P.2d at 160 (citation and internal quotation marks omitted).

*Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Hawai'i 36, 45, 305 P.3d 452, 461 (2013).

### Statutory Interpretation

> "Statutory interpretation is a question of law reviewable de novo." *State v. Wheeler*, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009) (internal quotation marks omitted). Our construction of statutes is guided by the following rules:
>
> > First the fundamental starting point for statutory-interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
>
> *Id.* (quoting *Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of the City & Cnty. of Honolulu*, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007)).

*First Ins. Co. of Hawaii v. A&B Props.*, 126 Hawai'i 406, 414, 271 P.3d 1165, 1173 (2012).

## III. DISCUSSION

A. Alleged retroactive application of HRS chapter 201H.

The Association alleges in its first point of error that the Circuit Court erred to the extent that it found that HHFDC had a lien that is senior and superior to all other parties except for ASB's lien and interest, based on the retroactive application of HRS chapter 201H. The Association's argument

centers on the alleged substantial difference between HRS section 201H-47 (Supp. 2009), the version of the statute relied upon in HHFDC's MSJ, and HRS section 201E-221(c) (Supp. 1991), the statute in effect at the time the Deed was recorded on June 12, 1991.

Preliminarily, we address whether the Circuit Court relied solely on the retroactive application of HRS chapter 201H in determining lien priority. In granting HHFDC's MSJ, the Circuit Court did not provide the bases for its ruling, thereby rendering the extent to which it relied on the retroactive application of HRS chapter 201H unclear. The Association recognizes this, stating that it "can only *assume* that the Circuit Court agreed with the arguments made by HHFDC when it granted summary judgment in favor of HHFDC," and that "it is *implicit* that the Circuit Court made a finding that HRS § 201H-47(e) was retroactive when it granted HHFDC's MSJ." (Emphasis added.) Nonetheless, the Association argues that "HHFDC relied heavily on Chapter 201H and language that was added to HRS § 201H-47 by Act 38," and therefore the Circuit Court, by implicit adoption of HHFDC's arguments, "erred when it retroactively applied HRS Chapter 201H and the new language added to HRS § 201H-47 by Act 38, as there was no expression of legislative intent to make the same retroactive."

In HHFDC's MSJ, HHFDC relied on HRS section 201H-47(a)(6) in maintaining that the SAE lien was a covenant running with the land, and on HRS section 201H-47(e)(2) in asserting that HHFDC was entitled to its share of appreciation as triggered by a foreclosure action. The reliance on these statutory provisions, however, was not in support of HHFDC's lien *priority*, but rather, was in support of HHFDC's assertion that its lien was a statutory lien and a covenant running with the land.

In fact, HHFDC's argument pertaining to lien priority relied on the principle of "first in time, first in right,"[5]

---

[5] *See, e.g., In re Estate of Patton*, 405 P.3d 205, 208 (Wash. Ct. App. 2017) ("As a general rule, the priority of competing lien claims depends on the order in which those claims attached to the encumbered property, subject to recording requirements. . . . The law labels this general rule as the 'first in time . . . first in right' principle." (citing *Homann v. Huber*,
(continued...)

determined from the relative dates in which HHFDC and the Association validly filed and perfected their liens. HHFDC argued that "the Chans took title to the [Property] subject to HHFDC's [SAE] lien by virtue of [the SAE Agreement] to the Deed ('SAE lien')," and that "HHFDC's SAE lien was filed and created in June 12, 1991 and is senior and superior to all others with the sole exception of [ASB's] lien and interest[.]" This is all the Circuit Court needed to rely on in determining lien priority. *See* Haw. Rev. Stat. §§ 501-82 (2006)[6], 502-83 (2006)[7] (effectively establishing that Hawai'i is a race-notice jurisdiction in which the person or entity who first duly records generally has priority); *cf. Pac. Tr. Co. v. Mataji Nagamori*, 32 Haw. 323, 326-29 (Terr. 1932) (interpreting a statute with similar language to HRS section 502-83 (2006), while highlighting the phrase "whose conveyance shall be first duly recorded," and determining that the purpose of that statute was not only to protect subsequent purchasers who purchased in good faith and without actual notice but who, in addition, recorded their conveyances first); *Wells Fargo Bank, N.A. v. Omiya*, 142 Hawai'i 439, 446-47, 420 P.3d 370, 377-78 (2018) (discussing Hawaii's two

---

[5] (...continued)
228P.2d 466 (1951))).

[6] This section provides, in pertinent part:

> **Tenure of holder of certificate of title.** (a) Every applicant receiving a certificate of title in pursuance of a decree of registration, and every subsequent purchaser of registered land who takes a certificate of title for value and in good faith, hold the same free from all encumbrances except those noted on the certificate *in the order of priority of recordation*, . . . .

Haw. Rev. Stat. § 501-82 (emphasis added).

[7] This section provides:

> **Effect of not recording deeds, leases etc.** All deeds, leases for a term of more than one year, mortgages of any interest in real estate, or other conveyances of real estate within the State, *shall be recorded in the bureau of conveyances. Every such conveyance not so recorded is void as against any subsequent purchaser, lessee, or mortgagee,* in good faith and for a valuable consideration, not having actual notice of the conveyance of the same real estate, or any portion thereof, or interest therein, *whose conveyance is first duly recorded.*

Haw. Rev. Stat. § 502-83 (emphasis added).

systems of recording title to real property, and citing HRS section 501-82(a) (Supp. 2016) for its proposition that "[t]he holder of a certificate of title holds it 'free from all encumbrances except those noted on the certificate *in the order of priority of recordation*' and other statutorily enumerated encumbrances" (emphasis added)).

In support of its "first in time, first in right" argument, HHFDC offered evidence that HHFDC's SAE lien was filed and perfected on June 12, 1991, and that the Association's judgment lien (which preceded the Association's assessment lien), was filed and perfected on November 14, 2006.

Since the Circuit Court's conclusion is supported by the "first in time, first in right" principle, the Association's first point of error is without merit. *See Strouss v. Simmons*, 66 Haw. 32, 40, 657 P.2d 1004, 1010-11 (1982) ("An appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance." (citing *Fed. Elec. Corp. v. Fasi*, 56 Haw. 57, 527 P.2d 1284 (1974))).

B.    The seniority of HHFDC's lien under the SAE Agreement.

In the Association's second point of error, it alleges that the Circuit Court erred in finding and concluding that under the SAE Agreement, HHFDC had a lien that is senior and superior to all other parties except for ASB's lien and interest. The Association argues that the Circuit Court disregarded the express language of Section 7 of the SAE Agreement ("Section 7"), which would bar the application of Sections 1-6—namely HFDC's rights to a share of Net Appreciation under Section 2 of the SAE Agreement ("Section 2"), HFDC's lien under Section 4 of the SAE Agreement ("Section 4"), and the determination of fair market value by appraisal under Section 3 of the SAE Agreement ("Section 3")—in the event of a foreclosure of the first mortgage. The Association also argues that the Circuit Court disregarded express language of Section 7 which states that the SAE Agreement is "null and void" upon conveyance of the Property through foreclosure sale. The dispositive issue is whether the lien in favor of HHFDC, created with the execution and recordation of the SAE Agreement, remains valid and enforceable in the event of a

11

foreclosure of the first mortgage, as was the case here.

The SAE Agreement is essentially a contract which subjected the Chans to terms and conditions pertaining to HHFDC's rights to its share of Net Appreciation, and as such, is subject to principles of contract interpretation. *See Balogh*, 134 Hawai'i at 40 n.7, 332 P.3d at 642 n.7 (citing *Moss*, 86 Hawai'i at 63, 947 P.2d at 375).

Generally, although a contract does not necessarily create lien rights; *cf. Jones v. Hawaiian Elec. Co.*, 64 Haw. 289, 297, 639 P.2d 1103, 1110 (1982) ("Since the lease agreement is an unsecured contract, it creates no lien, charge or encumbrance[.]"), *disavowed on other grounds by Camara v. Agsalud*, 67 Haw. 212, 685 P.2d 794 (1984); parties can agree to create lien rights or to subordinate their lien rights through the terms of a contract. *See Strouss*, 66 Haw. at 51, 657 P.2d at 1017 (analyzing a subordination agreement in the context of lien priority); *State Sav. & Loan Ass'n v. Kauaian Dev. Co.*, 62 Haw. 188, 613 P.2d 1315 (1980) (addressing whether a purchaser could subordinate its priority to a mortgage based on a horizontal property regime declaration, essentially a master deed).

Here, the SAE Agreement, which was signed by the Chans and recorded with the deed granting title to the Property to the Chans, established both HHFDC's lien rights securing the obligation to pay the Net Appreciation due to HHFDC and the subordination of HHFDC's lien rights to the mortgage lien rights of a first purchase money mortgagee. In its opening paragraphs, the SAE Agreement states that HFDC, HHFDC's predecessor-in-interest, assisted the grantor of the Chans' deed with the development of the Property and created an opportunity for the Chans to purchase the Property for less than its original fair market value in exchange for the Chans' agreement to pay HFDC a share of the Net Appreciation realized or deemed to be realized upon the sale or transfer of the Property. Section 1 of the SAE Agreement ("Section 1") defines certain terms, including Net Appreciation. Section 2 provides, among other things, that HFDC will immediately receive its share of the Net Appreciation when the Chans' interest in the Property is sold or transferred "in

any manner, voluntarily or involuntarily, including a judicial or nonjudicial foreclosure[,]" except upon certain "Permitted Transfers," for example, certain transfers resulting from the death of one or both of the Chans.[8]

Section 3 provides that "[w]henever it shall become necessary to determine the Net Appreciation," a particular appraisal process is to be used.[9] Section 4 provides that, subject to Section 7, HFDC's rights to be paid a share of the Net Appreciation will be in effect and constitute a lien on the Property until the Chans have sold or transferred the Property *and* HFDC has been fully paid its share of the Net Appreciation and any other amounts due. Section 5 of the SAE Agreement states that the SAE Agreement will not apply if HFDC exercises certain option rights. Section 6 of the SAE Agreement allows the Chans to pay HFDC all or part of its share of the Net Appreciation in advance of a sale or transfer.

Section 7 states, among other things, that HFDC's right to be paid a share of the Net Appreciation as a lien against the Property is subordinate to the mortgage lien rights of the first purchase money mortgagee:

---

[8] Section 2 provides, among other things, that:

Except for a "Permitted Transfer", . . . the Grantee promises and agrees that . . . if the Grantee shall be divested of title or any interest in the Property, in any manner, voluntarily or involuntarily, including a judicial or nonjudicial foreclosure sale," HFDC will immediately be entitled to a share of the Net Appreciation equal to:

HFDC's Percentage Share x Net Appreciation

[9] Section 3 provides, among other things, that:

Whenever it shall become necessary to determine the Net Appreciation, *HFDC will select an independent appraiser who has any of the qualifications set forth below* and who shall prepare a written appraisal of the Fair Market Value of the Property *within 45 calendar days after the Grantee has given HFDC written* **notice that the Grantee will be selling or transferring the Property** *together with the terms of such sale or transfer.*

(Emphasis added.)

7.   FIRST MORTGAGE PROTECTION

      The foregoing provisions [(i.e., Sections 1-6 of the SAE Agreement)] shall not apply with respect to:

(a)   The first purchase money mortgage ("First Mortgage"), if any, which is being placed on the Property.

. . . .

(c)   The rights of the First Mortgagee [(i.e., ASB)] to foreclose . . . pursuant to the remedies in the First Mortgage . . . in the event of default by the Grantee [(i.e., the Chans)], as mortgagor under the First Mortgage . . . .

(d)   Any person or persons acquiring the Property as a result of foreclosure . . . of the First Mortgage . . . .

. . . .

      HFDC [(i.e., HHFDC)] specifically subordinates any lien or contingent lien rights that HFDC may have under this [SAE Agreement] to the lien of the First Mortgage.  Any holder of the First Mortgage or any person who acquires legal title to the Property as a result of a foreclosure . . . of the First Mortgage shall acquire legal title free of such lien or contingent lien rights that HFDC may have under this [SAE Agreement].  This [SAE Agreement] shall be null and void *upon a conveyance* of the Property through a foreclosure sale[.]

(Emphasis added.)

      As stated above, the Association argues that Section 7 nullifies the entire agreement in this case because the Property was sold via foreclosure of the first mortgage.  This argument is without merit.  Section 7 provides that the SAE Agreement, which establishes HFDC/HHFDC's lien rights upon the Property, is null void *upon the conveyance* of the Property pursuant to a foreclosure of the first mortgage on the Property.  In other words, the Association contends that the buyer at the foreclosure sale takes the Property free and clear of the HHFDC's lien, regardless of whether HHFDC was paid all amounts secured by its lien rights.  Section 7, however, does not provide that the SAE Agreement is null and void *because* the Property was sold via a foreclosure, as opposed to a voluntary sale or transfer.

      A "court's objective is to 'ascertain and effectuate the intention of the parties as manifested by the contract in its entirety.'"  *Hawaiian Ass'n of Seventh-Day Adventists*, 130

14

Hawaiʻi at 45, 305 P.3d at 461 (quoting *Brown v. KFC National Mgmt. Co.*, 82 Hawaiʻi 226, 240, 921 P.2d 146, 160 (1996)). Section 7 should be interpreted in conjunction with the SAE Agreement's remaining sections. Mere complexity does not itself create ambiguity, *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209, 684 P.2d 960, 964 (1984) (citing *State Farm Mut. Auto. Ins. Co. v. Bailey*, 58 Haw. 284, 289, 568 P.2d 1185, 1188 (1977)), nor does "the parties' disagreement as to the meaning of a contract or its terms[.]" *State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 90 Hawaiʻi 315, 324, 978 P.2d 753, 762 (1999) (citing *State Farm Mut. Auto. Ins. Co. v. Fermahin*, 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992)).

Section 7 sets out the superior lien rights of the first mortgagee, including the consequences that a foreclosure on the first mortgage will have on HHFDC's lien rights. None of the circumstances under Section 7(a)-(d) suggest that HHFDC's SAE lien rights would be extinguished upon foreclosure of a first mortgage except that, upon conveyance of the Property pursuant to such a foreclosure, the lien rights would be extinguished as to the title acquired as a result of any foreclosure sale.

We reject the Association's interpretation of Section 7. The term "null and void" is couched between language focusing on the specific relationship of HHFDC's SAE lien rights to the rights of a first mortgagee or "any person who acquires legal title to the Property as a result of a foreclosure . . . of the First Mortgage" without reference to other junior lien holders, such as the Association. Furthermore, the Association's interpretation goes against the clear purpose and effect of Section 7. Section 7 serves to protect the first mortgagee by establishing that the SAE Agreement does not affect the first mortgagee's right to foreclose on the property or exercise its remedies under the first mortgage, and that HHFDC would subordinate its lien to the first mortgage, and also to protect those who acquire the Property as a result of the foreclosure of the first mortgage by nullifying HHFDC's lien rights upon the conveyance of the Property in foreclosure.

Section 2 lends additional support to this conclusion. Section 2 provides that "[e]xcept for a 'Permitted Transfer[,]'" which has not occurred in this case, "if the Grantee shall be divested of title or any interest in the Property, in any manner, voluntarily or involuntarily, *including a judicial* or nonjudicial *foreclosure sale*, HFDC will immediately be entitled to a share of the Net Appreciation[.]" (Emphasis added.) Under Section 2, HFDC is expressly entitled to its share of Net Appreciation in the event of a first mortgage foreclosure.

Based on what we construe to be the clear intent of Section 7 and a reading of the SAE Agreement in its entirety, we conclude that Section 7 only affects lien priority to the extent that it subordinates HHFDC's lien to ASB's first mortgage lien. "[T]he construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Hawaiian Ass'n of Seventh-Day Adventists*, 130 Hawai'i at 45, 305 P.3d at 461 (quoting *Brown*, 82 Hawai'i at 239, 921 P.2d at 159). The Association's second point is therefore without merit.

C.   The Circuit Court's determinations of the Property's fair market value and HHFDC's Net Appreciation are vacated and the amount due to HHFDC is to be redetermined on remand.

The Association's third point of error alleges that the Circuit Court's decision to award HHFDC $228,532 as Net Appreciation based on a fair market value of $480,000 was in error because: (1) to the extent that HHFDC was entitled to any proceeds from the foreclosure sale, its share should have been determined by the amount that the Chans were to realize from the foreclosure sale; (2) the appraisal process established by Section 3 does not apply to foreclosure sales; and (3) if the Section 3 appraisal process applies, HHFDC failed to comply with its terms.

The Association first contends that the $370,000 high bid at the foreclosure auction should be used as the fair market value because the Circuit Court determined it to be a "fair and equitable price . . . under the circumstances." Although the Circuit Court determined that the sale price was fair and

equitable for purposes of the foreclosure, and we find no error in the court considering that result, we do not agree that Sections 1.E, 2, and 3 together require that the foreclosure sale price must be used in calculating Net Appreciation. *See Hungate v. Law Office of David B. Rosen*, 139 Hawai'i 394, 409, 391 P.3d 1, 16 (2017) (recognizing that "the foreclosure process commonly fails to produce the fair market value for foreclosed real estate.") While the foreclosure sale price is one of the data points that the Circuit Court sitting as a court in equity might consider in determining fair market value of foreclosed property, it does not preclude consideration of an appraisal, particularly one expressly conducted pursuant to Sections 2 and 3, in reaching its conclusion.

The Association next contends that the appraisal process established by Section 3 does not apply to foreclosure sales. We disagree. Reading Sections 1.E.,[10] 2, and 3 in conjunction, we conclude that a properly-conducted appraisal would be acceptable as another data point from which the Circuit Court may determine fair market value.

The Association's final contention is that if the Section 3 appraisal process is required or permitted, HHFDC failed to comply with the established process. We agree. In this case, HHFDC does not establish that its September 2014 Appraisal was conducted in accordance with Section 3's requirements. First, the appraisal was prepared by Kathy Ann Oshiro under the direction and supervision of Brian Walther. It was not *prepared* by Walther, who appears to meet the appraiser qualifications; rather it was prepared by Oshiro, who does not appear to meet the appraiser qualifications, while under the

---

[10] Section 1.E. of the SAE Agreement defines "Fair Market Value" in the context of the Grantee's sale or transfer of the Property, without reference to the alternative circumstances of an involuntary divestment of the Property by foreclosure:

> "Fair Market Value" means the fair market value of the Property as determined by an appraisal obtained and performed in the manner described below in Section 3. *if and when the Grantee subsequently sells or transfers the Property*.

(Emphasis added.)

*direction and supervision* of Walther.[11] The September 2014
Appraisal, therefore, failed to comport with Section 3's
appraiser qualifications and requirements. Second, HHFDC did not
comply with Section 3's Grantee-notice requirements as HHFDC did
not mail a copy of the September 2014 Appraisal to the Chans
until December 11, 2014, more than ten business days after
completion of the appraisal, as an attachment to a letter dated
December 9, 2014.

It is not clear, however, whether, in reaching its
conclusion, the Circuit Court relied on the September 2014
Appraisal, the Chans' failure to contest HHFDC's appraisal, or
the Chans' failure to obtain their own independent appraisal
following the December 9, 2014 letter. Exhibit 1, included in
the December 9, 2014 letter, states that

> E.   If Owner [of the Property] disagrees with the fair
>      market value ("appraisal report") as determined, Owner
>      may obtain a second appraisal report, at Owner's
>      expense. . . .
>
> . . . .
>
> (3)   Owner shall submit a copy of the second
>       appraisal report to HHFDC within the earlier of
>       (i) ten (10) business days after it has been
>       completed or (ii) 45 calendar days after you
>       have received HHFDC's appraisal. HHFDC's
>       further review and re-calculation of the SAE
>       payment amount if applicable, *is dependent on
>       Owner's timely response to the requirements of
>       this section.*

(Emphasis added.) HHFDC brought this issue to the attention of
the Circuit Court at the January 15, 2015 hearing on ASB's Motion
for Confirmation of Sale. In its Further Order re: Confirmation
of Sale, it is unclear whether the Circuit Court considered the
issue of the Chans' failure to contest as it provided no basis
for its conclusion that HHFDC's proposed fair market value was

---

[11] The express terms of Section 3 state that "HFDC will select an
independent *appraiser who has any of the qualifications set forth below and
who shall prepare* a written appraisal of the Fair Market Value of the
Property[.]" The record reflects that HHFDC did not establish that Oshiro met
the appraiser qualifications under Section 3, as she only had a "CRA"
designation and yet Oshiro prepared the September 2014 Appraisal. The record
further reflects that Walther had an "SRA" designation and thus met the
appraiser qualifications under Section 3, and did not personally inspect the
Property or prepare the September 2014 Appraisal; rather Walther directed and
supervised Ms. Oshiro as she prepared the appraisal.

proper. Thus, it is unclear whether the Circuit Court strictly applied the requirements of Section 3 to the Chans notwithstanding HHFDC's failure to comply with either the appraiser qualification requirement or the notice requirement set forth in Section 3. Furthermore, the Circuit Court failed to explain whether it considered the foreclosure price, and if it did why it concluded that the foreclosure price should not be used to establish HHFDC's share of Net Appreciation under these circumstances. For these reasons, although HHFDC is entitled to Net Appreciation on the Property, we conclude that the Circuit Court erred to the extent that it utilized the HHFDC's appraised value of the Property without confirming the validity of the appraisal process or otherwise determining that the fair market value of the Property was $480,000 independent of the HHFDC appraisal.

Accordingly, we vacate the Circuit Court's determination of the amount to which HHFDC was entitled and remand for further proceedings.

    D.    The effect of the Circuit Court's failure to make findings and conclusions in its Further Order re: Confirmation of Sale and in not granting the Association's Motion for Reconsideration.

The Association's fourth point of error alleges that the Circuit Court erred in considering new evidence and exhibits submitted by HHFDC in making its findings and conclusions in the Further Order re: Confirmation of Sale, and not granting the Motion for Reconsideration which addressed the improper consideration of evidence and exhibits in determining the fair market value of the Property.

Because we vacate the Circuit Court's findings and conclusions in connection with the fair market value of the Property, *see supra*, we need not address this point.

    E.    HHFDC holds successor rights to those held by HFDC under the SAE Agreement.

The Association's fifth point of error alleges that the Circuit Court erred in finding and concluding that HHFDC has any rights under the SAE Agreement because HHFDC failed to prove that

it had been assigned HFDC's interest in the SAE Agreement. The crux of the Association's argument centers on HHFDC's reliance on Act 180, Session Laws of Hawai'i 2006, and Act 196, Session Laws of Hawai'i 2005 in asserting that HHFDC "assumed all deeds . . . executed by HFDC and [Housing and Community Development Corporation of Hawaii ("HCDCH")] as they pertained to HHFDC's functions." The Association contends that section 15 of Act 180 and section 25 of Act 196 do not clearly state that HHFDC has assumed the Deed in question or has assumed all deeds, but rather refers to all deeds "made applicable" to HHFDC, and therefore, "there is no indication which deeds were actually made applicable to HHFDC by said Acts."

Without reference to the SAE Agreement, the Association looks solely to the language in Act 180 and Act 196 and argues that neither Act clearly states that HHFDC has "assumed" the subject-Deed to this appeal. Regarding section 25 of Act 196, the Association points to nothing that would preclude HHFDC from assuming the subject-Deed, and we find none.[12] *See* 2005 Haw. Sess. Laws Act 196, §25 at 632. Regarding section 15 of Act 180 ("section 15"), we likewise discern no language to support the Association's argument as section 15 simply amends HHFDC's name from the Hawaii Housing Finance and Development Administration to Hawaii Housing Finance and Development Corporation. *See* 2006 Haw. Sess. Laws Act 180, § 15 at 789.[13] The Association therefore fails to show how Act 196 or Act 180 would not support a finding that HHFDC had been assigned the interests of HFDC.

---

[12] The Association highlights the following language from section 25 of Act 196 in support, paying particular attention to the phrase "made applicable":

> **All deeds** . . . executed or entered into by or on behalf of the . . . housing finance and development corporation pursuant to the Hawaii Revised Statutes, **which are made applicable to the Hawaii housing finance and development [corporation] by this Act, shall remain in full force and effect.**

(Emphasis and brackets in original, footnote omitted.)

[13] Section 15 states, "Act 196, Session Laws of Hawaii 2005, is amended by amending sections 20, 21, 22, 23, 24, and 25 by substituting the words 'Hawaii housing finance and development corporation', or like term, wherever the words 'Hawaii housing finance and development administration', or like term, appears as the context requires." 2006 Haw. Sess. Laws Act 180, §15 at 789.

Act 196 split HCDCH—the entity which replaced HFDC, *see* 1997 Haw. Sess. Laws Act 350, § 18 at 1090—into two entities, one of them being HHFDC, and established that HHFDC would "perform the function of housing financing and development." 2005 Haw. Sess. Laws Act 196, § 19 at 620. Act 350, upon replacing HFDC with HCDCH, transferred all of HFDC's rights to HCDCH and established that all deeds entered into by or on behalf of HFDC would remain in "full force and effect" as made applicable to HCDCH. *See* 1997 Haw. Sess. Laws Act 350, § 20 at 1091 ("All deeds, leases, contracts, loans, agreements, permits, or other documents executed or entered into by or on behalf of the [HFDC] . . . the substance of which are reenacted or made applicable to the [HCDCH] by this Act, shall remain in full force and effect."). Taken together, the language of Act 196 and Act 350 demonstrates that HHFDC would assume all rights of HCDCH, including those arising out of the Deed and SAE Agreement, originally held by HFDC, and suggests that HHFDC is HFDC's successor in interest. *See First Ins. Co. of Hawaii*, 126 Hawaiʻi at 414, 271 P.3d at 1173 ("[T]he fundamental starting point for statutory-interpretation is the language of the statute itself." (quoting *Wheeler*, 121 Hawaiʻi at 390, 219 P.3d at 1177)).

The express terms of the Deed provide that the SAE Agreement is between the Chans and "HFDC *and its successors and assigns*," that the provisions of the SAE Agreement are a "covenant running with the land," and that the Chans are perpetually bound to the SAE Agreement's restrictions until either HFDC released such restrictions or the restrictions expired by the terms of the SAE Agreement in favor of HFDC pursuant to the SAE Agreement. (Emphasis added.) Accordingly, the Circuit Court did not err in finding and concluding that HHFDC has rights, as the successor or assignee of HFDC, under the SAE Agreement, and the Association's fifth point of error is without merit.

> F.   The Circuit Court did not err in granting summary judgment as the value of HHFDC's lien is not "material" to HHFDC's MSJ.

In the Association's final point of error, it alleges

that the Circuit Court erred in granting summary judgment when genuine issues of material fact existed regarding the appraisal process and HHFDC's interest in the SAE Agreement.  The Association argues that there were genuine issues of material fact relating to HHFDC's calculation of its share of Net Appreciation, the determination of fair market value, and the fact that HHFDC failed to comply with the contractual requisites for appraisals obtained under Section 3.  We agree with the HHFDC's contention that none of these facts were material because none of them would establish or refute HHFDC's lien validity or priority.  Although HHFDC asked the Circuit Court to direct payment from the foreclosure proceeds determined by Section 3, this was not integral to its motion for summary judgment.

As discussed above, lien priority is determined according to the common law principle of "first in time, first in right."  See Haw. Rev. Stat. §§ 501-82, 502-83 (establishing race-notice jurisdiction); Mataji Nagamori, 32 Haw. at 326-29 (focusing on "whose conveyance shall be first duly recorded" in determining lien priority); Omiya, 142 Hawai'i at 446-47, 420 P.3d at 377-78 (noting order of priority of recordation).  The value of the lien is not an essential element in determining lien priority as it does not affect the recording date of that lien.  Furthermore, the Circuit Court only made a determination as to the issue of HHFDC's lien priority on summary judgment, not the value of HHFDC's lien.

Because we determine that HHFDC's lien is senior and superior to all other parties with the exception of ASB's lien and interest, there were no genuine issues of material fact.  Therefore, the Circuit Court did not err in granting HHFDC's MSJ, and the Association's sixth point of error is without merit.

IV.  DISPOSITION

Based on the foregoing, we affirm the following orders and judgments entered in the Circuit Court of the First Circuit: (1) the March 4, 2015 Order Granting HHFDC's MSJ;  (2) the March 4, 2015 Order Granting ASB's Motion for Confirmation of

Sale; (3) the March 4, 2015 Judgment;[14]/ and (4) the April 16, 2015 Judgment.

We vacate, however, the April 17, 2015 Further Order Re: Confirmation of Sale to the extent that it relates to the value of HHFDC's interest and remand to the Circuit Court of the First Circuit for further proceedings consistent with this Memorandum Opinion.

DATED:  Honolulu, Hawai'i, July 26, 2019.

On the briefs:

M. Anne Anderson and
Paul A. Ireland Koftinow
(Anderson Lahne & Fujisaki LLP)
for Villages of Kapolei
Association

Marissa H.I. Luning and
Colette L. Honda,
Deputy Attorneys General,
for Hawai'i Housing and Finance
Development Corporation

Presiding Judge

Lawrence M Reille
Associate Judge

Keith K Hiraoka
Associate Judge

---

[14]/     See n.2, supra.